UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

Juan Jose Carachure Santamaria,
and Cesar Antonio Ramos Jaime,
individually on behalf of themselves,
and on behalf of all others
similarly situated,

                                        Plaintiffs,

v.

VIRGINIA AGRICULTURAL
GROWERS ASSOCIATION, INC.,                CASE NO. __3:23cv396__

BASKERVILLE FARMS, INC.,

AND

DUSTY ROAD FARMS, INC.,

                                        Defendants.

## COMPLAINT

This is a suit for unpaid overtime under Virginia law. Plaintiffs Juan Jose Carachure Santamaria and Cesar Antonio Ramos Jaime, ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, file this Class against Virginia Agricultural Growers Association ("VAGA"), Baskerville Farms, Inc., and Dusty Road Farms, Inc. (collectively, "Defendants").

## <u>INTRODUCTION</u>

1.      This action is brought on behalf of a class of several thousand predominantly Mexican migrant workers who labored under the sweltering heat in fields across the Commonwealth of Virginia. The Plaintiffs and similarly situated class members are indigent

migrant workers whom VAGA brought to the United States on temporary H-2A work visas. The Plaintiffs and putative class members left behind their families and spent considerable time, effort, and expense in order to come to the United States and perform labor under conditions that are so grueling that Defendants have certified that American workers refused to perform such labor.

2.      Among all the Plaintiffs and putative class members are non-English speakers, who have little if any understanding of their rights while working in Virginia as farmworkers. The Defendants took full advantage of the Plaintiffs' and other class members' indigence, inability to speak or understand English, and their lack of understanding of the laws of the United States in order to forgo paying overtime payments.

3.      Plaintiffs and all others similarly situated were employed by Defendants in hourly (non-salary) capacities between July 1, 2021, and June 30, 2022, and were required by Defendants to work in excess of forty hours per week but did not receive overtime compensation.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which Plaintiffs and the majority of class members they seek to represent are citizens of Mexico.

5.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events forming the basis of this suit occurred in this District.

6.      Defendants are subject to personal jurisdiction in the Commonwealth of Virginia because (1) they are domiciled in Virginia, (2) they transact business in Virginia, and (3) their acts and omissions throughout Virginia gave rise to Plaintiffs' claims, including in Dinwiddie

County, which is in the Richmond Division.

## PARTIES

7.     Juan Jose Carachure Santamaria worked for VAGA and VAGA grower-member Edward Baskerville of Baskerville Farms Inc. in McKenney, Virginia (Dinwiddie County) for approximately eight or nine years on an H-2A visa.  He is a resident of Mexico.

8.     Cesar Antonio Ramos Jaime worked for VAGA and VAGA grower-member Dusty Road Farms, Inc. in Ringgold, Virginia (Pittsylvania County) in 2021 and 2022 on H-2A visas. He is a resident of Mexico.

9.     Virginia Agricultural Growers Association ("VAGA") is an agricultural association based in Halifax, Virginia, that employs primarily Mexican-national farmworkers alongside its Virginia-based grower-member farms by way of H-2A visas.

10.     Baskerville Farms Inc. is a farm and VAGA grower-member located at 21508 Baskerville Mill Road, McKenney, VA, 23872 (Dinwiddie County). The President and Registered Agent is Edward Baskerville.

11.     Dusty Road Farms, Inc. is a farm and VAGA grower-member located at 4891 Kentuck Rd, Ringgold, Virginia 24586 (Pittsylvania County). The President is Michael Thompson, and the Registered Agent is Jessica Thompson.

## FACTUAL ALLEGATIONS

### Virginia Overtime Wage Act and Agricultural Workers

12.     On July 1, 2021, the General Assembly enacted Va. Code § 40.1-29.2, the Virginia Overtime Wage Act ("VOWA"), which expressly defined "employee" as

> [A]ny individual employed by an employer, including employees of derivative carriers within the meaning of the federal Railway Labor Act, 45 U.S.C. § 151 *et seq*. 'Employee' does not include the following: (i) any individual who volunteers solely for

3

humanitarian, religious, or community service purposes for a public body, church, or nonprofit organization that does not otherwise employ such individual, (ii) **any person who is exempt from the federal overtime wage pursuant to 29 U.S.C. § 213(a),** and (iii) any person who meets the exemptions set forth in 29 U.S.C. § 213(b)(1) or 213(b)(11).

**Exhibit 1.** (Emphasis added)

13.     29 U.S.C. § 213(a)(6) is a subsection of the Fair Labor Standards Act ("FLSA") that relates to a subset of farmworkers, excluding from both minimum wage and overtime protections agricultural workers who are "employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor."[1] A "man-day" means any day during which an employee performs any agricultural labor for not less than one hour. 29 U.S.C. § 203(u).

14.     However, notably VOWA **did not** mirror the FLSA, which in 29 U.S.C. § 213(b)(12) additionally excludes all remaining agricultural workers from overtime, including those who worked on farms using more than five-hundred man-days of agricultural labor. 29 U.S.C. § 213(b)(12) was not incorporated into VOWA.[2]

15.     Thus, unlike the FLSA, from July 1, 2021, through June 30, 2022, VOWA contained no applicable exemption excluding farmworkers from entitlement to overtime.

**The H-2A Visa Program**

16.     The Plaintiffs and putative class members all came to Virginia to work on farms with H-2A visas.

---

[1] The exemption also includes other plainly irrelevant subsets of workers. *See* 29 U.S.C. §§ 213(a)(6)(B)-(E).

[2] In 2022, the General Assembly amended VOWA, effective July 1, 2022, to conform in full with FLSA's overtime provisions, thereby incorporating the exemption found in 29 U.S.C. § 213(b)(12) and removing agricultural workers' right to overtime under VOWA for hours worked beginning on July 1, 2022.

17.    The H-2A visa program is a nonimmigrant visa program that allows companies to bring workers to the United States to perform agricultural jobs on a temporary, less than year-round basis. *See* 8 U.S.C. § 1188; 20 C.F.R. § 653.500.

18.    To use the program, an employer must demonstrate to the U.S. Department of Labor ("DOL") (1) "that there are not sufficient U.S. workers able, willing, and qualified to perform the work" at issue, and (2) "that the employment of foreign workers will not adversely affect the wages and working conditions of U.S. workers similarly employed." 20 C.F.R. § 655.103(a).

19.    As a part of this process, employers must get certification from the DOL, which includes a job order and an application.  20 C.F.R. § 655.130; 20 C.F.R. §§ 655.121(a), 655.130(a).

20.    First, the employer files an H-2A Agricultural Clearance Order (ETA-790A) ("job order") with the DOL's National Processing Center ("NPC"), who will then send the prospective order to the State Workforce Agency ("SWA").  20 C.F.R. §§ 655.121(a) and (e).  The SWA may require the employer to make amendments in order to receive certification.  20 C.F.R. § 655.121(e)(2).

21.    Once the job order is approved, the employer files an Application for Temporary Employment Certification ("employment certification") with NPC. 20 C.F.R. § 655.130.

22.    As part of the certification process, employers must attempt to recruit U.S. workers.  20 C.F.R. §§ 655.153, 655.154.

23.    If the employer cannot fill the positions with U.S. workers, only then can they recruit foreign workers.  *See* 20 C.F.R. § 655.161.

24.    The employer must also provide proof of the inspection of housing, workers'

compensation insurance, and their recruitment attempts.  20 C.F.R. §§ 655.122(d)(6)(ii), 655.122(e); 20 C.F.R. § 655.156.

25.     Prior to the start of the job, the employer must arrange for visas for the workers through the Departments of State and Homeland Security.

26.     Employers must also provide transportation to the workers from their homes to the jobsite.  20 C.F.R. § 655.122(h).

27.     Employers must conspicuously post workers' rights posters.  20 C.F.R. § 655.135(l).

28.     The DOL allows associations to bring in H-2A workers as joint employers, sole employers, or agents. 8 U.S.C. § 1188; 20 C.F.R. § 655.103.

29.     In order for an agricultural association to file an employment certification as a joint employer it must meet certain specifications outlined in 20 C.F.R. § 655.131. Only if the agricultural association is filing its employment certification as a joint employer may it file a master application on behalf of its "employer-members." 20 C.F.R. § 655.103 ("[a]n agricultural association that files an *Application for Temporary Employment Certification* as a joint employer is, at all times, a joint employer of all the H–2A workers sponsored under the *Application for Temporary Employment Certification* and all workers in corresponding employment."). The employment certification application also must cover the same or comparable work, have the first dates of employment within two weeks of one another, and all places of employment must be within two contiguous states. The association must also identify the name and address of each employer-member employing H-2A workers, the total number of workers needed, the period of employment, the first date of need, and the crops and agricultural work to be performed. 20 C.F.R. § 655.131(a)(2).

30.    Agricultural associations filing as agents may not sign the application on behalf of their employer-members, but rather must obtain each employer-member's signature. 20 C.F.R. § 655.131(a)(3).

**VAGA's Role as a Joint Employer**

*Role in general*

31.    On information and belief, VAGA is a 501(c)(5) organization and has hundreds of grower-members with whom it jointly employs H-2A farmworkers.

32.    Grower-members are farm-owners who elect to pay membership fees to VAGA in order for VAGA to handle recruiting workers; obtaining visas for workers; interviewing, hiring and transporting workers to grower-member farms for the growing season; and then transporting those workers back to their country of origin at the end of the growing season.

33.    VAGA also allows grower-members to "share" workers, as discussed more below, and handles the logistics of transferring workers amongst its grower-members.

34.    VAGA has placed numerous workers at numerous Virginia farms, all of whom were paid, or not paid, according to the same practices and policies.

35.    On information and belief, grower-members can become VAGA members by applying, paying $350.00 membership fees, and providing VAGA with proof of worker's compensation insurance.

36.    VAGA handles the recruitment, interviewing, and hiring of U.S. and foreign workers for its grower-members. As a joint employer, VAGA takes steps in an attempt to ensure that its grower-members comply with applicable laws and regulations regarding wages, housing, and working conditions.

37.    VAGA trains and instructs grower-members about compliance with legal

requirements. It also provides grower-members with posters about workplace rights and health and safety information to post at their worksites.

38.     Upon information and belief, VAGA representatives visit grower-member farms to speak with workers about their working and housing conditions.

39.     VAGA receives complaints from workers about workplace issues. In response to a worker complaint, VAGA works with the grower and worker to try to resolve the issues. In some instances, VAGA reassigns workers to a different grower-member in response to worker complaints.

40.     Upon information and belief, VAGA also sometimes transfers workers between grower-members in response to the shifting needs of individual farms.

41.     VAGA holds itself out to the public, federal and state government agencies and departments, and workers as a "joint employer" of workers along with its grower-members.

42.     Upon information and belief, when workers make official complaints regarding workplace issues, VAGA responds to the complaints on behalf of the grower-members and VAGA. For example, when workers filed a complaint with Virginia Occupational Health and Safety ("VOSH") alleging workplace health and safety violations at a grower-member farm in 2022, Executive Secretary Jennifer Poole responded to VOSH on behalf of the farm and VAGA.

*Role specifically vis a vis Plaintiffs*

43.     VAGA has placed many workers, including Plaintiffs, at numerous Virginia farms, all of whom were paid, or not paid, according to the same practices and policies.

44.     VAGA prepared and submitted the legal documents necessary to bring in Plaintiffs and other class members to work for grower-members for the 2021 and 2022 growing seasons.

45.     For those two growing seasons, VAGA filed seventeen job orders, which indicated that VAGA and the 676[3] grower-members were "joint employers"

46.     First, VAGA submitted job orders setting forth the terms and conditions it was offering to workers. VAGA specified the rate of pay workers would receive and provided details related to workers' job duties, job requirements, frequency of pay, and estimated work schedule, *inter alia*. VAGA included a list of "Work Rules" related to employment and housing that all workers must follow, stating that violation of the rules may result in discipline or termination.

47.     Regarding pay rate, in both 2021 and 2022, VAGA set workers' wages at the Adverse Effect Wage Rate ("AEWR"), the wage floor set by the U.S. Department of Labor for H-2A workers.[4]

48.     VAGA's Executive Secretary, Jennifer Poole, signed the job orders on behalf of VAGA, thereby certifying that VAGA would comply with all applicable federal, state, and local employment-related laws and regulations.

49.     VAGA then submitted the job orders to the Virginia Employment Commission (VEC) for VEC to publish to U.S. workers seeking employment. In the job orders, VAGA stated that it would interview U.S. workers who were referred to it by the VEC and who applied to VAGA directly for the jobs. VAGA also had to take additional steps to recruit U.S. workers as well. *See* 20 C.F.R. §§ 655.153 and 655.154.

50.     VAGA additionally filed employment certifications, with Jennifer Poole again

---

[3] The seventeen (17) job orders in Section C "Additional Place of Employment Information" list a total of 676 agricultural businesses.

[4] DOL regulations require H-2A employers to pay H-2A workers no less that the hourly AEWR, the prevailing wage rate (if available), the Federal minimum wage, the State minimum wage, or the agreed-upon collective bargaining rate, whichever is highest. *See* 20 C.F.R. §§ 655.120(a) and 655.122(l). In Virginia in 2021 and 2022, the AEWR was the highest applicable wage rate and, thus, the minimum wage for H-2A workers.

affirming VAGA's status as a joint employer.  In the employment certifications collectively over the 2021 and 2022 growing seasons, VAGA requested approval to employ 2,460 H-2A workers[5] with the National Processing Center of the DOL's Office of Foreign Labor Certification.

**Exhibits 2 and 3.**[6]

51.     VAGA indicated on the employment certifications that it was applying as a "joint employer" of the workers. Bringing in workers as a joint employer allows VAGA to shift workers from grower to grower, thereby increasing VAGA's control over workers. Next, VAGA petitioned the U.S. Department of Homeland Security to issue H-2A visas to Plaintiffs and other class members.

52.     VAGA then recruited Plaintiffs and other H-2A workers through its agents in Mexico. The agents advised workers of the job offer, reviewed their documentation, and helped workers with the logistics of obtaining their visas at the U.S. consulate.

53.     VAGA arranged for buses to bring Plaintiffs and other workers from Mexico to VAGA's office in South Boston, Virginia.

54.     VAGA assigned Plaintiffs and other class members to one or more of its grower-members.  VAGA instructed workers that if they had an issue with their boss, VAGA could place them with a different grower-member farm. Growers came to the VAGA office to pick up the workers VAGA assigned to them.

55.     VAGA required Plaintiffs and other class members to sign a standard contract called the Agricultural Work Agreement, to which VAGA is a party. Upon information and

---

[5] This number is a total sum, and individual workers may be repeated between the two seasons.
[6] Exhibits 2 and 3 provide excerpts of H-2A disclosure data. U.S. Department of Labor, Employment and Training Administration, Performance Data, https://www.dol.gov/agencies/eta/foreign-labor/performance (last visited June 13, 2023)

belief, the contract form was prepared by VAGA and is standard across all grower-members. The contract specifies that both VAGA and the assigned grower-member or members are the workers' employer under the contract.

56.    The contract lays out the terms and conditions of workers' employment. It provides the hourly rate the worker will receive and a general description of job duties.  The contract also includes provisions requiring, *inter alia*, that VAGA and the assigned grower-member or members reimburse workers for transportation and subsistence costs and provide at least three-fourths of the hours promised in the job order.

57.    The contract incorporates a set of rules that govern workers' behavior at the jobsite(s) and in the housing.

58.    The contract provides that VAGA and the assigned grower-member or members may terminate workers for lawful job-related reasons.

59.    Plaintiffs and other class members received and signed the contract in Mexico or upon arrival to the United States.

60.    Upon information and belief, VAGA maintained employment records related to Plaintiffs and other class members.

**VAGA Jointly Employed Plaintiffs and Similarly Situated Workers**

61.    VAGA and its grower-members jointly employed Plaintiffs and all similarly situated farmworkers.

62.    VAGA has, exclusively or in tandem with its grower-members to jointly determine, share, or allocate, the power to:

     a.    direct and control the workers;
     b.    hire and fire the workers; and
     c.    modify the terms or conditions of the workers' employment.

63.    In addition, VAGA, has, exclusively or in tandem with its grower-members to jointly determine, share, or allocate, responsibility over functions such as setting wage rates; job placement and transfers; ensuring compliance with legal standards regarding wages, housing, and working conditions; and requesting work visas.

64.    In addition, VAGA and its grower-members jointly controlled (or VAGA exclusively controlled) all terms and conditions of Plaintiffs' employment, including pay practices.

65.    VAGA and its grower-members have continuous long-term relationships with a high degree of permanency.

**The Job Orders**

66.    For the 2021 and 2022 growing seasons, VAGA filed at least seventeen (17) job orders seeking 2,460 H-2A workers for various spans of time between July 1, 2021, and June 30, 2022. Upon information and belief, VAGA employed approximately the same number of H-2A workers that it was certified to employ.

67.    At a minimum the applicable job orders include: [1] JO-A-300-20365-984493, [2] JO-A-300-20363-981352, [3] JO-A-300-20365-984846, [4] JO-A-300-21046-077561, [5] JO-A-300-21043-075427, [6] JO-A-300-21106-229916, [7] JO-A-300-21110-242180, [8] JO-A-300-21134-316016, [9] JO-A-300-21316-703320, [10] JO-A-300-21348-763820, [11] JO-A-300-22006-814194, [12] JO-A-300-22007-815233, [13] JO-A-300-22007-815638, [14] JO-A-300-22040-889582, [15] JO-A-300-22042-896918, [16] JO-A-300-22101-055877, [17] JO-A-300-22103-063817.  These job orders are laid out in more detail in the chart below.

| VAGA Job Order Number | Total # of H-2A Workers Certified | Start Date | End Date | # of Weeks Covered by VOWA | Rate of Pay in Job Order[7] | AEWR | Exhibit |
|---|---|---|---|---|---|---|---|
| JO-A-300-20365-984493 | 23 | 3/1/2021 | 12/1/2021 | 21 | $12.67 | $13.15 | 4 |
| JO-A-300-20363-981352 | 166 | 3/1/2021 | 12/1/2021 | 21 | $12.67 | $13.15 | 5 |
| JO-A-300-20365-984846 | 18 | 3/1/2021 | 11/10/2021 | 18 | $12.67 | $13.15 | 6 |
| JO-A-300-21046-077561 | 33 | 4/16/2021 | 12/1/2021 | 21 | $13.15 | $13.15 | 7 |
| JO-A-300-21043-075427 | 566 | 4/13/2021 | 12/1/2021 | 21 | $13.15 | $13.15 | 8 |
| JO-A-300-21106-229916 | 366 | 6/15/2021 | 12/1/2021 | 21 | $13.15 | $13.15 | 9 |
| JO-A-300-21110-242180 | 32 | 6/19/2021 | 12/15/2021 | 23 | $13.15 | $13.15 | 10 |
| JO-A-300-21134-316016 | 86 | 7/15/2021 | 12/1/2021 | 19 | $13.15 | $13.15 | 11 |
| JO-A-300-21316-703320 | 14 | 1/11/2022 | 11/10/2022 | 23 | $13.15 | $14.16 | 12 |
| JO-A-300-21348-763820 | 26 | 2/12/2022 | 11/10/2022 | 19 | $13.15 | $14.16 | 13 |
| JO-A-300-22006-814194 | 163 | 3/7/2022 | 12/1/2022 | 16 | $14.16 | $14.16 | 14 |
| JO-A-300-22007-815233 | 24 | 3/8/2022 | 11/4/2022 | 15 | $14.16 | $14.16 | 15 |
| JO-A-300-22007-815638 | 43 | 3/8/2022 | 12/15/2022 | 15 | $14.16 | $14.16 | 16 |
| JO-A-300-22040-889582 | 24 | 4/10/2022 | 12/15/2022 | 11 | $14.16 | $14.16 | 17 |
| JO-A-300-22042-896918 | 533 | 4/12/2022 | 12/1/2022 | 10 | $14.16 | $14.16 | 18 |
| JO-A-300-22101-055877 | 39 | 6/10/2022 | 12/15/2022 | 3 | $14.16 | $14.16 | 19 |
| JO-A-300-22103-063817 | 304 | 6/11/2022 | 12/1/2022 | 2 | $14.16 | $14.16 | 20 |

68.     Since some individuals who worked for VAGA in 2021 returned in 2022, VAGA employed between approximately 1,290 and 2,460 H-2A workers during the time the VOWA overtime law was in effect (the "Relevant Time Period").

69.     Each job order sets the anticipated total number of hours per week at forty-five. In reality, however, workers regularly worked between fifty and sixty hours per week. During the busiest times of the year, some workers worked upwards of seventy to eighty hours per week.

70.     Upon information and belief, VAGA also employed U.S. workers in addition to

---

[7] The first job orders submitted each year reflect the prior year's AEWR, but workers brought in under those job orders should have received the current AEWR.

H-2A workers during the relevant time period.

**Plaintiffs' and Class Members' Work**

71.     VAGA hired H-2A workers to perform work described in the job orders.

72.     The job orders include tasks such as preparing soil, planting, transplanting, cultivating, pruning, cutting, deadheading, weeding, culling, pinching, pollinating, harvesting, trimming to shape, spacing, mowing, spraying with pesticides and fertilizing crops. Many workers harvested tobacco. Other crops include cucumbers, squash, sweet potatoes, potatoes, peppers, grapes, berries, asparagus, broccoli, beans, cantaloupes, peas, pumpkins, melons, tomatoes, corn, and other miscellaneous fruits or vegetables.

73.     Workers' tasks also included cleaning; operating a forklift to transport plant materials in the greenhouse or nursery area; loading and unloading plants; hauling and spreading topsoil, fertilizer, etc. to condition land; and operating equipment necessary for the maintenance and operation of the grounds and facilities.  In certain instances, workers were also required to cut hay, make hay bales, and transport those bales, in addition to taking care of livestock.

74.     Workers generally arrived in the spring and worked until the fall. Some workers arrived in the early spring, around March, but most workers arrived between April and June. They would typically work through October or November.

75.     In 2021, VAGA workers, including Plaintiffs, were paid $13.15 per hour.

76.     In 2022, VAGA workers, including Plaintiffs, were paid $14.16 per hour.

77.     During the Relevant Time Period, VAGA workers consistently worked long workdays, far in excess of forty hours per week. While the amount of overtime hours varied worker to worker and week to week, upon information and belief, the average overtime worked per week was between ten and thirty hours. VAGA workers, including Plaintiffs, however, were

paid only their straight wage for all hours worked, including those hours in excess of forty.

78.     VAGA and grower-members knowingly and intentionally failed to pay overtime, or at a minimum acted with reckless disregard for the rights of each Plaintiff and similarly situated laborers with respect to overtime.

79.     VAGA and grower-members' failure to pay overtime cost indigent workers millions of dollars in unpaid overtime wages. VAGA certified in its job orders that the workers would work five hours of overtime. However, in actuality, farmworkers regularly worked between ten and thirty hours of overtime per week. Assuming that VAGA's H-2A workers only worked an average of ten hours of overtime per week, which is lower than Plaintiffs' estimated weekly overtime averages, workers would have lost out on an estimated $2,531,474.40 in unpaid overtime wages (exclusive of any liquidated or treble damages) between July 1, 2021 and June 30, 2022. This estimate does not include U.S. workers employed by VAGA during the relevant time period.

**Individual Plaintiffs' Facts**

*Juan Jose Carachure Santamaria*

80.     Mr. Juan Jose Carachure Santamaria was connected in Mexico to a contractor with VAGA to work for VAGA and VAGA grower-member Baskerville Farms Inc. in 2013 or 2014.

81.     Mr. Carachure Santamaria does not speak English and finished his schooling in Mexico's equivalent to the sixth grade.

82.     Mr. Carachure Santamaria's job duties varied from planting, to taking care of the plants, including watering and cutting the flowers, and eventually cutting the plants.  Essentially, he worked on all parts of growing tobacco.

83.    During the relevant time period, Mr. Carachure Santamaria worked for VAGA and Baskerville Farms Inc. from April - October.  He worked an average of seventeen hours of overtime per week.

84.    The hours and schedule Mr. Carachure Santamaria worked depended on the tasks. When planting, he worked approximately Monday through Friday from 6:30 in the morning until 6:30 or 7:00 at night and on Saturdays from 6:30 in the morning until 4:00 in the afternoon.

85.    When they were cutting flowers, he would work approximately Monday to Friday 7:00 in the morning until 6:00 in the evening and Saturdays from 7:00 in the morning until 4:00 in the afternoon.

86.    When they were cutting the tobacco, he would work approximately Monday to Friday from 7:00 in the morning until 6:00 in the evening and Saturdays from 7:00 in the morning until 4:00 in the afternoon, but he would also work one or two Sundays a month for three to four hours a day.

87.    During the 2021 season, Mr. Carachure Santamaria was paid $13.15 per hour. During the 2022 season, he was paid $14.16 per hour.

88.    Mr. Carachure Santamaria, however, was not paid any extra amount for his overtime hours.

89.    Mr. Carachure Santamaria did not keep copies of his hours or paystubs, but he remembers the approximate schedule.

90.    It is VAGA and Baskerville Farms' duty to maintain records of hours work and pay received, not Mr. Carachure Santamaria's.

91.    VAGA and Baskerville Farms' failure to pay sufficient wages to Mr. Carachure Santamaria as legally required caused Mr. Carachure Santamaria monetary injury.

*Cesar Antonio Ramos Jaime*

92.    Mr. Cesar Antonio Ramos Jaime was connected in Mexico to a contractor with VAGA to work for VAGA and VAGA grower-member Dusty Road Farms Inc., a tobacco farm, in 2021.

93.    Mr. Ramos Jaime does not speak English and finished his schooling in Mexico's equivalent to high school.

94.    Mr. Ramos Jaime's job duties were cutting tobacco.

95.    During the relevant time period, Mr. Ramos Jaime worked for VAGA and Dusty Road Farms between late June and early November 2021, and between early June and early September 2022. He worked an average of approximately ten hours of overtime per week.

96.    During the 2021 season, Mr. Ramos Jaime was paid $13.15 per hour.  During the 2022 season, he was paid $14.16 per hour.

97.    Mr. Ramos Jaime, however, was not paid any extra amount for his overtime hours.

98.    For example, for the week of July 16, 2021- July 22, 2021, he worked fifty-five hours, but he only received $13.15 per hour. even those in excess of forty hours. He was paid $719.96 = (54.75*13.15). Whereas if Mr. Ramos had been paid his overtime for those fifteen hours, he would have received $821.88 = (40*13.15 + 15*(13.15*1.5)).

99.    Mr. Ramos Jaime kept some of his paystubs, but not all; however, it is the duty of VAGA and Dusty Road Farms to keep records of his pay and hours worked, not Mr. Ramos Jaime's.

100.    VAGA and Dusty Road Farms' failure to pay sufficient wages to Mr. Ramos Jaime as legally required caused Mr. Ramos Jaime monetary injury.

17

## CLASS ACTION ALLEGATIONS

101.    The individual Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal

Rules of Civil Procedure

### A. Class Definition

102.    Plaintiffs, the Rule 23 Class Representatives, seek to maintain claims pursuant to

Va. Code § 40.1-29.2, individually, and on behalf of classes of current and former farmworkers

who worked exclusively within Virginia for VAGA and its grower-members, for more than forty

hours in any given week, from July 1, 2021, to June 30, 2022.

### B. Efficiency of Class Prosecution of Common Claims

103.    Certification of classes of current and former VAGA workers is the most efficient

and economical means of resolving the questions of law and fact which are common to the

claims of the Class Representatives and the proposed class. Conversely, proceeding on an

individual case basis will require the filing of potentially scores of duplicative individual suits,

wasting judicial time and resources and creating the risk of inconsistent or varying adjudications

of common issues.

### C. Numerosity and Impracticality of Joinder

104.    The class which the Class Representatives seek to represent is so numerous that

joinder is impracticable. On information and belief, the putative class during the liability periods

number between approximately 1,290 and 2,460 current and former farmworkers who did not

receive time-and-a-half payments during the relevant time period from the Defendant.

105.    The class is comprised principally of indigent migrant farmworkers who maintain

their residences in locations throughout Mexico and are primarily monolingual Spanish speakers.

The relatively small size of individual claims, the geographical dispersion of the class, and the

financial circumstances of the class members make the maintenance of separate actions by each class member economically infeasible.

106.    The class is so numerous that joinder of all members is impracticable.

**D. Common Questions of Law and Fact**

107.    The putative class members, all working within the same agricultural association, all challenge the same pay practices, deriving from the same pay rates and application of law. Those practices apply uniformly and present identical questions of law and fact with respect to the Class Representatives and those whom they seek to represent.

**E. Typicality of Claims and Relief Sought**

108.    The claims of the Class Representatives are typical of those of the class members as a whole in that their claims are based on collective job orders and business and compensation practices. The relief sought by the Class Representatives for unpaid overtime wages is also typical of the relief which is sought on behalf of the proposed class.

**F. Adequacy of Representation**

109.    Plaintiffs are adequate class representatives for the class. Their interests are co-extensive with those of the members of the proposed class they seek to represent. They are committed to being representatives of the class and have retained undersigned counsel who are experienced in prosecuting class action employment cases to protect the interests of the class.

110.    Plaintiffs know of no conflicts of interest among members of the class.

**G. Rule 23(b)(3) Requirements**

111.    Common questions of law and fact predominate over any questions affecting only individual members because the basis of the claims herein is the common failure to pay overtime wages.

112.    A class action is superior to other available methods for adjudicating the controversy because other methods would involve the filing of numerous individual claims that are based on the same centralized scheduling and compensation facts and the same legal issues regarding same. Numerous individual cases similar to Plaintiffs would clog the Court's docket and waste judicial time and resources. Moreover, multiple individual cases based on the same legal issues could lead to inconsistent or varying adjudications of the same issues.

113.    The Class Representatives and counsel are not aware of any other litigation concerning the controversy that has already begun by proposed class members within the Commonwealth of Virginia.

114.    It is desirable to concentrate the claims in this forum because the employment practices complained with respect to the Class Representatives occurred in this forum.

115.    The Class Representative and counsel do not foresee any substantial difficulties in managing a class action and counsel is experienced in managing class action litigation in this forum.

## COUNT I

### VIOLATIONS OF VA. CODE § 40.1-29.2, THE VIRGINIA OVERTIME WAGE ACT (VOWA)

116.    Plaintiffs reallege each and every paragraph in the Complaint as if alleged herein.

117.    Va. Code § 40.1-29(J) provides Plaintiffs and other similarly situated employees with a private right of action to bring overtime claims for all hours worked in excess of forty hours per week.

118.    During the weeks between July 1, 2021, and June 30, 2022, Plaintiffs and similarly situated workers regularly worked more than forty hours per week.

119.    Defendants were aware that Plaintiffs and other farmworkers consistently worked

more than forty hours.

120.    On information and belief, Plaintiffs and other similarly situated workers did not receive any overtime premium for their hours worked over forty in a workweek.

121.    Between July 1, 2021, through June 30, 2022, Defendants violated Va. Code § 40.1-29.2 by failing to pay Plaintiffs, and those similarly situated, an overtime premium for all hours worked in excess of forty hours thereby depriving Plaintiffs, and others who were subject to the same policies, of wages at an overtime pay rate(s) of their wage plus a one-half (1/2) premium.

122.    Defendants knew that Plaintiffs were not paid overtime wages for all hours worked in excess of forty hours. Defendants knowingly and willfully failed to pay Plaintiffs all overtime wages due, such that treble damages are appropriate.

123.    By failing to pay Plaintiffs and the class they represent their lawfully owed overtime premium for every hour worked in excess of forty hours in any given workweek, Defendant violated VOWA in respect to the Plaintiffs and the class they represent to the injury of Plaintiffs' and the class they represent and are liable to them in damages. Pursuant to Va. Code § 40.1-29(J), Plaintiff and putative collective members are entitled to their unpaid overtime wages due, an additional amount equal to their unpaid overtime premiums, trebled, the costs of suit, and reasonable attorneys' fees.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs request that this Court will:

A.    Certify the identified class pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), and order that Court approved notice be issued to putative class members;

21

B.    Award each Plaintiff and each class member all unpaid overtime wages;

C.    Award each Plaintiff and each class member liquidated damages equal to the unpaid overtime wage compensation owed;

D.    Award each Plaintiff and each class member treble damages under Va. Code § 40.1-29(J) for a knowing violation of the law;

E.    Pre-judgment and post-judgment interest;

F.    Reasonable attorneys' fees and costs including expert fees expended in the prosecution of this case and the investigation that preceded it; and

G.    Any and all further relief permissible by law.

## **Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a TRIAL BY JURY for all claims and issues so triable.

Dated: June 15, 2023

Respectfully submitted,

PLAINTIFFS,
individually on behalf of themselves
and on behalf of all others similarly situated
By Counsel


By:    /s/ *Craig Juraj Curwood*
Craig Juraj Curwood (VSB No. 43975)
Zev H. Antell (VSB No. 74634)
Samantha Galina (VSB No. 96981)
**BUTLER CURWOOD, PLC**
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
Email: craig@butlercurwood.com
    zev@butlercurwood.com
    samantha@butlercurwood.com

-and-

Rachel C. McFarland (VSB No. 89391)
Jason B. Yarashes (VSB No. 90211)
Kristin Donovan (VSB No. 92207)
**LEGAL AID JUSTICE CENTER**
1000 Preston Avenue, Suite A
Charlottesville, Virginia 22903
Telephone: (434) 529-1813
Facsimile: (434) 977-0558
Email: RMcFarland@justice4all.org
        jasony@justice4all.org
        kristin@justice4all.org

***Attorneys for Representative Plaintiffs and
Putative Collective/Class Members***